IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

MARYANN LOSSER,                          )
                        Plaintiff,       )
                                         )
        vs.                              )        Civil Action No. 07-1473
                                         )        Judge Terrence F. McVerry/
MICHAEL J. ASTRUE, Commissioner          )        Magistrate Judge Amy Reynolds Hay
of Social Security,                      )
                        Defendant.       )

REPORT AND RECOMMENDATION

I.      Recommendation

        Plaintiff, Maryann Losser, filed the instant complaint on November 5, 2007,

pursuant to Section 205(g) of the Social Security Act, as amended, 42 U.S.C. § 405(g), seeking

review of the Commissioner of Social Security's finding that, as of June 1, 2004, plaintiff was no

longer disabled and, thus, no longer entitled to Supplemental Security Income benefits ("SSI")

under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381-1383f.  Cross-motions for

summary judgment are pending.  It is respectfully recommended that the motion for summary

judgment filed on behalf of plaintiff [Dkt. 13] be denied, and that the defendant's motion [Dkt.

15] be granted.

II.     Report

        A.      Procedural History

        Plaintiff filed an application for SSI on September 12, 1991, alleging a disability

due to depression (Tr. 36).  Based on his review of plaintiff's file, an administrative law judge

("ALJ") issued a decision on March 25, 1993, finding that plaintiff was disabled as of September

12, 1991 -- the date of her application -- as the result of severe mixed personality disorder,

dysthymic disorder and alcohol dependency (Tr. 36-39).

Plaintiff's case was reviewed by the Social Security Administration in 1997 and, in a decision dated July 17, 1997, it was determined that no medical improvement had occurred and that plaintiff continued to be disabled (Tr. 56-59). On June 17, 2004, however, after plaintiff's case was reviewed a second time, it was determined that plaintiff's impairments were no longer severe and benefits were discontinued (Tr. 92-99). Plaintiff filed a timely request for a hearing on October 26, 2004, and on November 29, 2005, a hearing was held before an ALJ (Tr. 105, 504-33). Plaintiff, who was represented by counsel, and a vocational expert ("VE") were called to testify.

Plaintiff testified that she married Robert Losser in May of 1998 and that she lived with him, her stepson, her stepson's daughter and the child's mother (Tr. 507). Plaintiff also testified that she was born on July 19, 1969, and, thus, was 36 years old at the time of the hearing, and that she completed tenth grade (Tr. 508).

Plaintiff indicated that she worked for about a month as a waitress when she was about 16 years old but was fired because she kept getting into arguments and fistfights with the other employees (Tr. 508-09). Plaintiff also indicated that she worked for the previous six months delivering the Butler Eagle Newspaper but quit on the day of the hearing because she was having physical problems with her right shoulder (Tr. 509). Plaintiff testified that she made $125.00 a month but that they were living off of her husband's income who works full time as a clerk for Sunoco A-Plus (Tr. 509-10). Plaintiff also testified that her granddaughter, who was 5½ years old at the time and in plaintiff's custody, was on disability (Tr. 510).

It also appears, according to plaintiff's testimony, that she had rotator cuff surgery

2

in July of 2005, after which she took four weeks off from work, but was still having trouble lifting over 5 pounds or lifting her arm up over her head (Tr. 511).  Plaintiff allowed that although her job delivering papers was a "walking job," she does drive (Tr. 511).

Plaintiff indicated that she is 4' 11" tall, weighs 179 pounds, that she usually smokes one-half a pack of cigarettes a day, takes Prozac, Seroquel, Amoxicillin, Lipitor and prescription strength Ibuprofen on a regular basis, and uses an albuterol inhaler on an as need basis (Tr. 512-14, 518).  Plaintiff also indicated that she was evaluated for sleep apnea and sleeps with a CPAP machine, and that, while she used to have a problem with drinking, she has been only an occasional drinker since 1997 (Tr. 514-15).  When asked whether she was receiving psychiatric treatment, plaintiff indicated that she sees Dennis Lobb and Dr. Simmons at Irene Stacy Community Mental Health Center ("Irene Stacy") once every three months and that she sees a therapist there once every two weeks (Tr. 516-17).

As well, plaintiff testified that she generally gets up around 6:00 a.m. and helps her granddaughter get ready for school and then she goes "off into [her] own little world" until its time to go deliver papers, which she does between 1:00 p.m. and 2:00 p.m. (Tr. 519).  Plaintiff indicated that when she gets home around 2:30 p.m. or 3:00 p.m. her granddaughter is already there, and that she goes back into her "little world" (Tr. 520).  Plaintiff allowed that although she drives and does some of the shopping, her husband does most of the shopping as well as the cooking and cleaning because she has no interest in doing it (Tr. 520).  Plaintiff also allowed that she limits herself to lifting five to ten pounds because of her shoulder and that she cannot stand for longer than fifteen minutes or walk for more than two or three blocks because of the mild arthritis in her lower back (Tr. 521-22).

Plaintiff testified that she has no contact with anyone except for her husband and her granddaughter and that the court has prohibited her from having any contact with her daughters from previous marriages as they have been adopted (Tr. 522-23).

In response to questioning by her attorney, plaintiff clarified that, with regard to her daughters, the court terminated her parental rights and that her granddaughter is actually her step-granddaughter (Tr. 523). Plaintiff also indicated that when she started delivering papers in May of 2005, she only had one route and delivered fifty to fifty-five papers but that she picked up another route over the summer and was delivering 125 papers when she gave notice the previous month (Tr. 523-24). Plaintiff reiterated that she takes ibuprofen at least six times a day because of her shoulder and back and because of headaches which she gets five or six times a day (Tr. 524).

Plaintiff further testified that the doctors at Irene Stacy told her she has Post Traumatic Stress Disorder as the result of an automobile accident that occurred in August of 2004, when she swerved to avoid a deer and hit a tree head on, and another accident in May of 2005, when she collided with a tractor trailer (Tr. 525-526). Plaintiff indicated that she has trouble driving now and that whenever a tractor trailer is around her she has to pull over and wait until it goes by (Tr. 526). Plaintiff also indicated that she has trouble sleeping because of sleep apnea and the nightmares that she has had since her accidents (Tr. 525).

As well, plaintiff testified that she has carpel tunnel syndrome in her left wrist and that when its cold or rainy she has trouble gripping things (Tr. 526-27). Plaintiff also indicated that she has not consumed any alcohol for three years (Tr. 527).

A VE was also called to testify at the hearing and, in response to a hypothetical

involving an individual with plaintiff's age, education and lack of work experience who was limited to simple, repetitive tasks, who should avoid close interaction with co-workers and direct interaction with the public and who was limited to light work, testified that such a person would be able to work as an assembler and that, at the light level, approximately 715,000 such jobs existed in the national economy and approximately 156,000 at the sedentary level (Tr. 528). The VE also testified that such a person would be able to do light work as a press machine operator and a stock clerk, and those jobs existed in significant numbers in the national economy as well (Tr. 528-29). When asked whether her testimony would change if the same person also had to avoid changes in the work setting and intensive supervision, the VE said it would not (Tr. 529).

Having elicited from plaintiff that she hears voices and that "they" talk to her about three times a day, the ALJ then asked the VE whether her testimony would remain the same if the person also needed to avoid a competitive production rate pace (Tr. 529-30). The VE allowed that not all the jobs mentioned would be affected but that the assembly jobs would be reduced by fifty percent (Tr. 530). If, however, the individual were off task for a half hour every one and a half hours on the job because of auditory hallucinations, the VE testified that such a limitation would not be compatible with such jobs, which require an individual to stay at pace until the scheduled break times (Tr. 530).

In response to questions from plaintiff's counsel, the VE allowed that if the same individual also had poor or no ability to relate to co-workers, deal with the public or work stresses, behave in an emotionally stable manner, relate predictably in social situations or demonstrate reliability, he or she would not be able to engage in substantial gainful activity (Tr. 531).

5

Based on this evidence as well as the supporting medical records, the ALJ concluded in an opinion dated June 12, 2006 (Tr. 16-23), that plaintiff's medical condition had improved as of June 1, 2004, and that she had the residual functional capacity to perform light work limited to simple, repetitive tasks; avoiding close interaction with co-workers and the public; without exposure to change in work setting and without intensive supervision (Tr. 20, Finding No. 6). As such, the ALJ determined that plaintiff's disability ended as of June 1, 2004 (Tr. 23, Finding No. 14). The Appeals Council ultimately denied plaintiff's request for review on August 31, 2007, making the ALJ's decision the final decision of the Commissioner (Tr. 4-6).

**B.    Standard of Review**

Presently before the court are the parties' cross-motions for summary judgment. Summary judgment is appropriate when there are no disputed material issues of fact, and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56; Edelman v. Commissioner of Social Security, 83 F.3d 68, 70 (3d Cir. 1996). In reviewing the administrative determination by the Commissioner, the question before the court is whether the Commissioner's decision is supported by substantial evidence. 42 U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389, 401 (1971); Smith v. Califano, 637 F.2d 968, 970 (3d Cir. 1981). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Kangas v. Bowen, 823 F.2d 775, 777 (3d Cir. 1987). Substantial evidence is defined as less than a preponderance and more than a mere scintilla. Perales, 402 U.S. at 402. If supported by substantial evidence, the Commissioner's decision must be affirmed. Hartranft v. Apfel, 181 F.3d 358, 360 (3d Cir. 1999).

**C.    Discussion**

### 1.  The Analytical Framework

The Social Security Act, 42 U.S.C. § 423(f), provides that a recipient may be deemed ineligible for benefits if it is determined that his or her disability has ceased.  That determination must be supported by substantial evidence of medical improvement and the claimant must be able to engage in substantial gainful activity.  20 C.F.R. § 423(f)(1).  The provisions of 20 C.F.R. § 416.994(b)(5) provide a sequential multi-step inquiry applicable to termination decisions.[1]  If, at any point, there is sufficient evidence to support a finding that the claimant is still unable to engage in substantial gainful activity, the inquiry ends, and benefits may be continued.  The ALJ listed these sequential steps and the applicable exceptions, and discussed each of them with reference to the record evidence.  His analysis ended at the final step when he concluded that plaintiff was capable of performing substantial gainful activity and that jobs accommodating her residual functional capacity were available in the national economy.

---

[1]     The SSA's regulations prescribe a seven-step procedure to determine whether a SSI recipient has experienced medical improvement and can engage in substantial gainful activity: 1) Does the claimant have an impairment or combination of impairments which meets or equals the severity of an impairment listed in Appendix 1? If so, the disability is continuing; 2) Has there been medical improvement - i.e. has there been a change in the symptoms, signs, and/or laboratory findings associated with the impairment? If there has not been a decrease in medical severity, there is no medical improvement; 3) If there has been medical improvement, is it associated with the ability to do work - i.e. has there been a decrease in the severity of the impairment(s) identified at the time of the most recent comparison point and an increase in the functional capacity to do basic work activities? 4) If there has been no medical improvement or if the medical improvement is not related to the ability to do work, do any of the listed exceptions to medical improvement apply? If none of the exceptions specified applies, termination is improper; 5) If there has been medical improvement relating to the ability to do work, or if one of the specified exceptions applies, is the combination of current impairments severe? If not, the disability has ended; 6) If current impairments are severe, can the claimant return to past relevant work? If the answer is yes, the disability has ended; 7) If the claimant cannot return to past relevant work, is she able to perform other substantial gainful activity? If yes, disability has ended.

## 2. Allegations of Error

### a. Finding of Medical Improvement

Plaintiff challenges the ALJ's finding, at Step Two of the analysis, that there had been a decrease in medical severity of her impairments as of June 1, 2004. Specifically, plaintiff complains that the ALJ did not properly compare her mental health records and that he based his conclusions on a number of factual inaccuracies.

The record evidence available in July of 1997, when plaintiff was last found to be disabled, showed that she suffered from depression and a personality disorder resulting in her being markedly limited in her ability to work within a schedule; to work without isolating herself socially; to maintain pace; to work without being duly distracted by her symptoms and taking frequent breaks; and to function independently (Tr. 18, Finding No. 2; 163-67).

The question then becomes whether there was substantial evidence available to the ALJ which permitted him to conclude that there had been medical improvement in plaintiff 's psychological condition as of June 1, 2004.

On May 10, 2004, T. David Newman, Ph.D., consultatively examined plaintiff for the Pennsylvania Bureau of Disability Determination (Tr. 315-17). Dr. Newman's report preliminarily indicates that plaintiff drove herself to the appointment; that she was "pleasant-mannered, conversant, and entirely cooperative with evaluation procedure;" and that before the interview began, plaintiff inquired, "So, do I get to keep my SSI?" (Tr. 315). Dr. Newman further indicated that when asked why she believed she was disabled from work, plaintiff responded, "I don't know" (Tr. 315).

Plaintiff reported taking twenty milligrams of Prozac per day as prescribed by her

family physician to "calm [her] down" and help her "get through the day" (Tr. 315). She also told Dr. Newman that she handles the finances for her household; drives where she needs to go; does the shopping for her household; prepares meals; and cleans her house (Tr. 316). She also reported that she takes care of her four year old granddaughter (Tr. 316).

Dr. Newman noted that plaintiff exhibited adequate hygiene and grooming and made good eye contact (Tr. 316). Although it appears that plaintiff began the interview mildly anxious, Dr. Newman reported that this condition did not persist and that he established a good rapport with her (Tr. 316). He also reported that plaintiff was alert to her surroundings and appropriately responsive to all questions; that her speech was articulate, relevant, coherent, and rational; that plaintiff displayed a "good range of affective expression with sufficient depth which was at no time inappropriate;" that her mood was reasonably euthymic with no aspect of depression; and that she exhibited no disturbance of thought process and no delusions or ideas of reference (Tr. 316). Although Dr. Newman reported that plaintiff was unable to interpret sayings and that her fund of general information was weak, her abstract thinking was intact for similarities and differences and her insight was good (Tr. 316-17). Plaintiff was also able to make calculations without pencil and paper and was able to subtract serial sevens without hesitation or error (Tr. 317). Dr. Newman further indicated that plaintiff demonstrated no disturbance in concentration; that her memory was essentially intact; that she exhibited no disturbance of impulse control; that her test judgment and social judgment were intact and she appeared capable of recognizing relevant cues from social situations and adjusting her behavior accordingly (Tr. 317). On mental status examination, plaintiff was fully oriented to time, place, and person (Tr. 317).

Dr. Newman indicated no Axis I diagnosis finding that plaintiff displayed no symptoms of a clinical disorder (Tr. 317). Dr. Newman's assessment showed that plaintiff demonstrated no difficulty with understanding and retaining instructions to perform simple, repetitive tasks or for maintaining concentration and pace for the same purpose, and she demonstrated no particular difficulty regarding her capacity to interact with the general public or maintain relationships (Tr. 317-19). He therefore concluded that plaintiff had no areas of particular difficulty in her capacity to function in a work setting (Tr. 317-19).

On June 8, 2004, Sanford Golin, Ph.D., a state agency psychologist, reviewed the medical evidence of record and assessed that plaintiff no longer had a medically determinable impairment (Tr. 320-33). On September 10, 2004, Douglas Schiller, Ph.D., also reviewed plaintiff's records and agreed with that assessment (Tr. 332).

Randon C. Simmons, M.D., plaintiff's treating, board-certified psychiatrist from Irene Stacy, evaluated her in July and September 2005 (Tr. 500-03). On July 14, 2005, plaintiff complained of a depressed mood and irritability and reported sleeplessness and nightmares relating to the loss of custody of her children and two motor vehicle accidents (Tr. 501). Dr. Simmons conducted a mental status examination noting that plaintiff was pleasant and polite, maintained normal eye contact and was fully oriented (Tr. 502). Plaintiff's speech pattern was normal in rate and rhythm, was not pressured and had no loose associations (Tr. 502). Dr. Simmons also reported that plaintiff's affect was appropriate without signs of agitation or irritability and that her memory and recall was intact (Tr. 502). Although Dr. Simmons found that plaintiff's insight was minimal he also reported that her judgment was good and that she evidenced no violent thinking or intent toward herself or others (Tr. 501). Dr. Simmons

diagnosed plaintiff with was post traumatic stress disorder at Axis I (clinical disorders), and borderline intellect and bipolar disorder at Axis II (personality disorders and mental retardation) (Tr. 503). Dr. Simmons indicated that plaintiff might benefit from a mood stabilizer and prescribed one milligram of Risperdal every night at bedtime and continued her on ten milligrams of Prozac, which she had been taking for the past ten years (Tr. 500-01, 503).

Plaintiff had a followup visit with Dr. Simmons in September 2005 (Tr. 500). Plaintiff reported that she stopped taking the Risperdal because it upset her stomach (Tr. 500). She also reported that she resumed delivering newspapers, albeit with assistance, and actually had two routes (Tr. 500). Plaintiff reiterated that her main complaints were low mood with irritability (Tr. 500). Clinically, however, Dr. Simmons reported that plaintiff was pleasant, polite, and animated (Tr. 500). Dr. Simmons suggested increasing plaintiff's Prozac to twenty milligrams daily (Tr. 500).

On November 17, 2005, Robert L. Eisler, M.D., evaluated plaintiff on behalf of plaintiff's attorney (Tr. 493). Dr. Eisler reported plaintiff's subjective complaints of agitation, anger and isolating behavior as well as difficulties sleeping and concentrating (Tr. 493). Plaintiff also reported having suicidal ideation and auditory hallucinations, i.e., hearing angels and hearing her dead mother's voice (Tr. 493). Dr. Eisler reported that plaintiff's mental status examination revealed that plaintiff remembered four out of four test memory words; that she could name numerous presidents; that she did "a good job" of serial subtraction of sevens from 100; and that she was able to repeat a five digit but not a seven digit number (Tr. 494). Dr. Eisler indicated that plaintiff showed average intelligence and no signs of dementia (Tr. 494). Dr. Eisler nevertheless opined that plaintiff was unable to work and scored her Global Assessment of

11

Functioning ("GAF") at 20 (Tr. 494).[2]

Notwithstanding Dr. Eisler's ultimate conclusion, in the court's view, this evidence amply supports the ALJ's decision regarding medical improvement and continuing disability.

It also refutes plaintiff's contention that the only report which arguably supports the ALJ's findings is that of Dr. Newman. Clearly, Dr. Simmons' clinical findings as well as the assessments of State Agency Psychologists Golin and Schiller provide support that plaintiff no longer had a medically determinable impairment. Moreover, as argued by the Commissioner, even Dr. Eisler's objective findings suggest that medical improvement has occurred.[3]

---

[2]     The GAF scale rates psychological, social and occupational functioning. The GAF rating is the single value that best reflects the individual's overall level of functioning at the time of the examination. American Psychiatric Association, Diagnostic & Statistical Manual of Mental Disorders ("DSM-IV"), pp. 32-35 (4th ed. 1994). A GAF of 20 correlates with "some danger of hurting self or others (e.g., suicide attempts without clear expectation of death; frequently violent; manic excitement) or occasionally fails to maintain minimal personal hygiene (e.g., smears feces) or gross impairment in communication (e.g., largely incoherent or mute)." Id.

[3]     The court also notes that plaintiff's argument that Dr. Newman's report should be discounted as "incompetent" because he declined to render a diagnosis in Axis I, is unpersuasive. Review of Dr. Newman's report demonstrates that he performed a thorough and complete psychological evaluation (Tr. 315-317). As well, Dr. Newman explained his "non-diagnosis," indicating that plaintiff had not displayed any symptoms of a diagnosable mental disorder during the exam; that plaintiff had not offered any particular areas of difficulty regarding her capacity to function in the work setting or to understand and retain instruction to perform simple, repetitive tasks or maintain concentration or pace; that she is managing well with respect to maintaining the household and the care of her granddaughter; that she indicated no difficulty in her capacity to interact with the public or maintain her current interpersonal relationships; and that she was able to manage her personal funds competently (Tr. 317). The fact that Dr. Newman's examination proved unfavorable to plaintiff, does not render it "incompetent." Moreover, the ALJ expressly declined to accept Dr. Newman's "non-diagnosis" as dispositive of plaintiff's disability issue (Tr. 19-20). He did, however, find that the report was "undeniably ... strong evidence that the claimant has improved very significantly" (Tr. 20). Thus, it appears that the ALJ appropriately weighed Dr. Newman's report in conjunction with the other evidence of record.

Plaintiff nevertheless argues that the ALJ's decision that medical improvement occurred is undermined by his reliance on a number of factual inaccuracies. Plaintiff first takes issue with the ALJ's finding that Dr. Eisler's report, in which he indicated that plaintiff exhibited signs of psychosis, and plaintiff's credibility were suspect because plaintiff testified that she told her "physical therapist" about her auditory hallucinations but did not report them to her mental health specialist (Tr.19). Although it appears clear that plaintiff testified at the hearing that she told Dr. Simmons, her mental health specialist and not her physical therapist, that she heard voices (Tr. 529-30), the import of the ALJ's observation is that the reports from Dr. Simmons during the relevant period do not reflect that she told him about any auditory hallucinations (Tr.500-03). To the contrary, Dr. Simmons' reports indicate that plaintiff complained only of irritability and depressed mood (Tr. 500, 501). Thus, although the ALJ misstated plaintiff's testimony regarding whom she informed of her hallucinations, it does not negate the fact that her testimony is not bourne out by Dr. Simmons' records.

Plaintiff also quarrels with the ALJ's conclusion that Dr. Eisler's assignment of a GAF rating of 20 in November of 2005 (Tr. 494), was suspect because it rests on clinical findings that are not reproduced anywhere in the record (Tr. 19). Plaintiff contends that the factual inaccuracy of the ALJ's findings in this regard is evidenced by a psychiatric evaluation performed in June of 1997 in which it was reported that plaintiff had some "marginal illusions and possible hallucinations" (Tr. 177). The obvious difficulty with plaintiff's argument, however, is that the 1997 psychiatric evaluation upon which she relies not only occurred prior to her previous assessment, at which time it was determined that her benefits should continue (Tr. 56-59), but took place seven years before the ALJ's finding that medical improvement had

occurred (Tr. 20, Finding No. 5). The 1997 evaluation is therefore irrelevant to the question of whether plaintiff exhibited medical improvement since June of 2004, and does not negate the ALJ's conclusion that Dr. Eisler's GAF rating of 20 in November of 2005 was unsupported by the record.[4]

The ALJ also stated in his decision that, upon review of Dr. Simmons' notes, plaintiff "was continued on the same medication" (Tr. 19). Plaintiff contends that this statement is an inaccurate assessment of Dr. Simmons' notes because in July of 2005 he not only continued plaintiff on ten milligrams of Prozac but started her on one milligram of Risperdal and, in September of 2005, he suggested increasing the Prozac to twenty milligrams and adding Seroquel if there was no improvement after another four weeks (Tr. 500, 503). The court finds plaintiff's argument to be without merit.

Although Dr. Simmons suggested increasing plaintiff's dosage of Prozac from ten to twenty milligrams, she nevertheless was "continued on" Prozac. Moreover, Dr. Simmons indicated in his subsequent report, less than two months later, that plaintiff discontinued using the Risperdal because it upset her stomach and, thus, she could not have been taking it for much more than a month (Tr. 500). Under these circumstances, it does not appear that the ALJ's statement that plaintiff "was continued on the same medication" is sufficiently inaccurate to

---

[4]     Moreover, as argued by the Commissioner, a GAF of 20 correlates with "some danger of hurting self or others (e.g., suicide attempts without clear expectation of death; frequently violent; manic excitement) or occasionally fails to maintain minimal personal hygiene (e.g., smears feces) or gross impairment in communication (e.g., largely incoherent or mute)," DSM-IV, at 34, and does not appear to be supported by Dr. Eisler's own clinical findings (Tr. 494).

undermine his entire decision.[5]

Plaintiff's argument disputing the ALJ's finding that she demonstrated improved parental competency because she has "custody" of her granddaughter, is equally unavailing (Tr. 20). Although, to be sure, plaintiff testified at the hearing that the child and the child's parents lived in the house along with her and her husband and that no formal custody proceedings through the court had occurred, she also testified that she had been granted "custody" of her granddaughter "informally" (Tr. 510-11), and reported to Dr. Eisler around the same time that she and her husband were raising the child (Tr. 493). As well, when asked by Dr. Newman how she spent her time, she indicated that she sits around the house and takes care of her granddaughter (Tr. 316). As such, the ALJ's finding that plaintiff demonstrated improved parental competency, having previously been found unable to care for her own children, is supported by substantial evidence.

Plaintiff also argues that the ALJ's statement that she has become much more active since 1997 as evidenced, in part, by the fact that she delivers newspapers to "some 400 customers" (Tr. 20), is inaccurate because plaintiff testified at the hearing that when she started she only delivered 50-55 papers and that, even after she picked up a second route, she only delivered 125 papers (Tr. 519-20). Review of the record, however, shows that the ALJ relied on treatment notes from plaintiff's physical therapist who reported that plaintiff "has been delivering 400 papers a day," information that he presumably obtained from plaintiff (Tr. 20, 401). Thus, there is not only evidence of record to support the ALJ's findings but even if plaintiff's hearing

---

[5]     The court further notes that although Dr. Simmons suggested in September of 2005, that plaintiff's dosage of Prozac be increased to twenty milligrams, plaintiff reported to Dr. Eisler in November of 2005 that she was still only taking ten milligrams (Tr. 493).

testimony that she delivered 125 papers is given credence, it still supports the ALJ's finding that she had become more active than in 1997 when she was not working at all.

Although the Commissioner concedes that there is no evidence of record to support the ALJ's statement that plaintiff "drove herself to the hearing" (Tr. 20), the import of his statement is that plaintiff is able to and does, in fact, drive herself where she needs to go, which plaintiff does not dispute. Indeed, plaintiff twice testified at the hearing that she drives (Tr. 511, 520), and reported to Dr. Newman that she drove herself unaccompanied to the appointment with him in May of 2004, and is otherwise able to drive herself where she needs to go (Tr. 315, 316). Thus, the ALJ's reference to plaintiff's ability to drive is amply supported by the record.

Plaintiff also takes issue with the ALJ's findings that she regularly engaged in activities of daily living such as cleaning, shopping, and handling the business associated with a paper route, i.e., record-keeping, billing and collecting money (Tr. 20). Plaintiff contends that because plaintiff testified at the hearing that her husband took care of most of the cleaning and shopping (Tr. 520), and because the record is devoid of any direct evidence that plaintiff was responsible for record keeping, billing or collections, the ALJ's findings of medical improvement are unsupported. Plaintiff's argument, however, overlooks Dr. Newman's evaluation in which plaintiff reported that she handles the household finances, that she does the shopping and that both she and her husband prepare the meals and keep the house clean (Tr. 316). As noted by the ALJ, plaintiff could not have managed this level of activity in 1997, based on the residual functional capacity assessed by the Social Security Administration at that time, thereby evidencing medical improvement (Tr. 20).

Finally, plaintiff finds fault with the ALJ's assessment of her subjective complaints and, in particular, his finding that, "when plaintiff is motivated to work she can and does work," as evidenced by the fact that "she made nearly $5,000.00 in 2005 from her paper route" (Tr. 21). Because plaintiff testified at the hearing that she earned $125.00 per month from her paper route and that she only worked delivering papers for six months, plaintiff argues her earnings could only have been $750.00 and the ALJ's finding to the contrary and his ultimate conclusion that she can work when motivated to do so based on her 2005 earnings is erroneous. Although the Commissioner concedes that it is unclear how the ALJ arrived at the $5000.00 figure, he suggests that the discrepancy can be explained by the difference between the number of papers plaintiff reported delivering at the hearing (125) and the number reported to her physical therapist (400). He also argues, and the court agrees, that how much money plaintiff earned while delivering newspapers does not negate the fact that she was, in fact, delivering them and engaging in work activity. Thus, the conclusion drawn by the ALJ, that plaintiff can and does work when motivated to do so, is sufficiently supported by the record.

It therefore appears that to the extent the ALJ may have made statements not fully supported by the record, those statements do not suffice to negate the evidence discussed above, which clearly demonstrates that his finding of medical improvement is supported by substantial evidence.

### b. Failure to give controlling weight to Dr. Eisler's Opinion

Plaintiff also argues that the ALJ erred by failing to give controlling weight to the evaluations of Dr. Eisler which, according to plaintiff, clearly show that she continues to be disabled. Plaintiff's argument, however, is without merit.

First, the first two of the three evaluations performed by Dr. Eisler occurred in May of 1992, and June of 1997, respectively, and, while properly considered when plaintiff's case was reviewed in 1997, have no bearing on whether plaintiff has demonstrated medical improvement since that time.

Second, plaintiff's argument is premised on the "treating physician doctrine," which suggests that the ALJ is to give greater weight to a treating physician's opinion since treating physicians "are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [a claimant's] medical impairments." 20 C.F.R. § 404.1527(d)(2). See Morales v. Apfel, 225 F.3d 310, 317 (3d Cir. 2000). Dr. Eisler, however, is not plaintiff's treating physician. Indeed, by plaintiff's own admission, Dr. Eisler examined plaintiff only three times in thirteen years, the last time at the behest of plaintiff's counsel for purposes of proving disability. Rather, it appears from the record that Dr. Simmons is plaintiff's treating psychiatrist whose opinion the ALJ expressly accorded greater weight (Tr. 19, 516, 517).

Moreover, opinions by medical doctors may be rejected where they are internally inconsistent or contradicted by other evidence of record. 20 C.F.R. §§ 416.927(c)(2), (d)(4). The ALJ in this case fully explained his reasons for rejecting the disability determination reached by Dr. Eisler, finding that his conclusions were inconsistent with the conclusions of plaintiff's long-time source of mental health treatment -- Dr. Simmons (Tr. 19). More specifically, the ALJ noted that while Dr. Eisler found signs of marked depression and even frank psychosis, Dr. Simmons reported no such findings or other objective abnormalities but rather indicated that plaintiff complained only of low mood and irritability (Tr. 19, 500-03). Dr. Eisler's conclusions were also inconsistent with Dr. Newman's findings which the ALJ found to be strong evidence

that plaintiff had improved significantly (Tr.19-20). It therefore appears that the ALJ's conclusion that Dr. Eisler's opinion should not be given any weight is supported by substantial evidence.

          **c.**      **Failure to pose a complete hypothetical question to the VE**

Plaintiff also complains that the ALJ ignored the VE's testimony regarding plaintiff's limitations and failed to incorporate those limitations into the hypothetical questions.

We note at the outset that plaintiff appears to be challenging the ALJ's findings with respect to her RFC itself rather than to the adequacy of the hypothetical questions posed to the VE. Indeed, as pointed out by the Commissioner, the Court of Appeals for the Third Circuit has recognized that:

> [O]bjections to the adequacy of hypothetical questions posed to a vocational expert often boil down to attacks on the RFC assessment itself. That is, a claimant can frame a challenge to an ALJ's reliance on vocational expert testimony at step 5 in one of two ways: (1) that the testimony cannot be relied upon because the ALJ failed to convey limitations to the vocational expert that were properly identified in the RFC assessment, or (2) that the testimony cannot be relied upon because the ALJ failed to recognize credibly established limitations during the RFC assessment and so did not convey those limitations to the vocational expert. Challenges of the latter variety . . . are really best understood as challenges to the RFC assessment itself.

Rutherford v. Barnhart, 399 F.3d 546, 554 n.8 (3d Cir. 2005). Plaintiff's argument clearly falls into the latter category and, thus, presents a challenge to the ALJ's determination that, after medical improvement, plaintiff had the mental residual functional capacity to perform simple, repetitive tasks; avoiding close interaction with coworkers and the public; in a job not exposing her to changes in a work setting; and without intensive supervision (Tr. 20, Finding No. 6).

Plaintiff contends that the ALJ's hypothetical question should also have reflected: (1) plaintiff's need to be "off task for ½ hour every 1½ hour on the job;" (2) her "poor or no useful ability to relate to coworkers, deal with the public, and deal with work stresses;" and (3) her "poor or no useful ability to behave in an emotionally stable manner, relate predictably in social situations, or demonstrate reliability" (Pl.'s Br. at 26).

Plaintiff, however, has not pointed to any clinical findings from any mental status examination during the relevant period to support her position and argues only that the limitations omitted from the hypothetical questions "are limitations that the plaintiff actually has." (Pl.'s Br. at 26). Review of the medical examinations, however, show that the limitations contained in the ALJ's hypothetical questions are amply supported and that the limitations suggested by plaintiff's proposed hypothetical questions are not.

Indeed, Dr. Newman's clinical findings show that plaintiff had the ability to make calculations without pencil and paper, the ability to perform serial sevens, and that she had intact concentration and memory (Tr. 316-17). See 20 C.F.R. § 404, Subpt. P, app. 1, § 12.00(C)(3) (2007) (Concentration is assessed by tasks such as serial sevens or threes and through tasks that test the short-term memory). As well, Dr. Simmons reported that plaintiff was fully oriented without loose associations with intact memory and recall and good judgment (Tr. 501-02). Even Dr. Eisler reported that plaintiff had intact memory; that she could perform serial sevens; and that she showed no signs of dementia (Tr. 494). Thus, the clinical evidence supports the ALJ's finding that plaintiff was limited to simple, repetitive tasks and not the marked type of concentration deficit requiring her to be "off task ½ hour every 1½ hours," that plaintiff has suggested in her proposed hypothetical.

Plaintiff's suggestion that she had "poor or no useful ability to relate to coworkers, deal with the public, and deal with work stresses" and "poor or no useful ability to behave in an emotionally stable manner, relate predictably in social situations, or demonstrate reliability," is also belied by the record.   Indeed, Dr. Simmons' indications were that plaintiff was pleasant and polite and maintained normal eye contact and that she had an appropriate affect with no signs of agitation or irritability, had good judgment, and no violent thoughts toward herself or others (Tr. 501-02).   In addition, Dr. Newman observed that plaintiff maintained a good degree of eye contact; a good range of affective expression; a reasonably euthymic mood; full impulse control; intact social judgment; and good insight (Tr. 316-17).   Moreover, there is no report from anyone after June 1, 2004, including Dr. Eisler, in which it was  reported that plaintiff behaved in an emotionally unstable manner, acted rudely or unpredictably or otherwise had the type of marked social limitations alleged by plaintiff.

Thus, the clinical findings from the relevant period substantially support the ALJ's RFC and hypothetical question limiting her to avoiding close interaction with coworkers and the public; in a job not exposing her to changes in a work setting; and without intensive supervision.  See Chrupcala v. Heckler, 829 F.2d 1269, 1276 (3d Cir. 1987).  See also 20 C.F.R. § 416.946(c) (The responsibility of assessing a claimant's RFC is reserved to the ALJ).   The ALJ was therefore correct in accepting the VE's testimony that jobs existed in the national economy that a person with these limitations could perform, and the fact that plaintiff's counsel elicited responses from the VE regarding limitations not supported by the record is of no moment.  See Craigie v. Bowen, 835 F.2d 56, 57-58 (3d Cir. 1987) (holding that an ALJ need not accept the answer to a hypothetical question premised upon evidence deemed unsupported, inaccurate, or

non-credible).

In accordance with the Magistrates Act, 28 U.S.C. § 636(b)(1)(B) & (C), and Local Rule 72.1.4 B, the parties are permitted to file written objections and responses thereto in accordance with the schedule established in the docket entry reflecting the filing of this Report and Recommendation. Failure to timely file objections may constitute a waiver of any appellate rights.

Respectfully submitted,

*/s/  Amy Reynolds Hay*
United States Magistrate Judge

Dated: 22 July, 2008

cc:     Hon. Terrence F. McVerry
        United States District Judge

        All counsel of record by Notice of Electronic Filing